[Crim. No. 230.    Third Appellate District.—October 28, 1913.]

## THE PEOPLE, Respondent, v. ANDREW STEIN, Appellant

CRIMINAL LAW—PRELIMINARY EXAMINATION—RIGHT TO COUNSEL.—It is unnecessary for the magistrate at a preliminary examination to go through the formality of advising the accused of his right to counsel, when he has already employed an attorney who is present when the case is called.

ID.—READING OF COMPLAINT TO ACCUSED—WHETHER MAY BE OMITTED.— An information will not be set aside because the complaint was not

read to the accused at the preliminary examination, where his attorney, who was present with him, waived the reading and announced a readiness to proceed with the examination.

ID.—INFORMING ACCUSED OF CHARGE AGAINST HIM—WHETHER COMPLAINT MUST BE ACTUALLY READ.—The statute does not in terms declare that the complaint shall be read to the accused at the preliminary examination, but that the magistrate must inform him of the charge.

ID.—HOMICIDE—SHOOTING INTO. CROWD—MALICE IMPLIED.—Where one deliberately and unnecessarily shoots into a crowd of people, with an utter disregard of consequences, whereby human life is destroyed, malice is implied and the crime is murder, although he has no malice against any particular person in the crowd.

ID.—PARTIAL INSANITY—RESPONSIBILITY OF ACCUSED—INSTRUCTIONS.— It is not error to instruct the jury in a homicide case that, although the defendant, at the time he committed the act, was laboring under partial insanity, "if he still understood the nature and character of his act and its consequences, and had a knowledge that it was wrong and criminal, and he had mental power at the time sufficient to apply that knowledge, and to know if he committed the act he would be doing wrong, and receive punishment, and that he possessed a will sufficient to restrain the impulse he may have had to kill, arising from his diseased mind, then such partial insanity will not exempt him from responsibility, under the law, for such act, and you should find him guilty, in the degree shown by the evidence," provided the jury were convinced by the evidence beyond a reasonable doubt that the killing of the deceased by the defendant was without legal justification or legal excuse.

ID.—VOLUNTARY INTOXICATION—RESPONSIBILITY OF ACCUSED—INSTRUCTIONS.—Where the defense in a homicide case is insanity, partly superinduced by intoxicating liquors, and the prosecution claims that the accused was not insane but merely in a state of voluntary intoxication at the time of the offense, and considerable testimony is addressed to this feature of the case, it is proper to instruct the jury that "no act committed by a person in a state of voluntary intoxication is less criminal. by reason of his having been in such condition, but that where the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, evidence of the intoxicated condition of the accused at the time of the committing the act is admissible and may be considered by the jury in determining the purpose, motive or intent with which he committed such act."

ID.—DEFENSE OF INSANITY—INSTRUCTION CAUTIONING JURY.—An instruction in which the court cautions the jury to examine with care the defense of insanity interposed by the defendant "lest an ingenious counterfeit of the malady furnish protection to the guilty," while open to criticism, is not ground for reversal.

Id.—Instructions—General Objection—Review on Appeal.—Where error is claimed in rulings of the trial court on instructions, it is the duty of the party complaining on appeal to point out the error, otherwise it will not be reviewed, as it is not incumbent on a reviewing court to search through the record for the purpose of discovering for itself wherein the action of the trial court in the respect complained of involves error prejudicial to the defendant.

Id.—Argument of District Attorney—Whether Objectionable.—Where the evidence in a homicide case shows that the defendant, while intoxicated, deliberately and without provocation, shot into a crowd, the district attorney is justified in stating in his argument to the jury that if there ever was a case in his experience wherein there was disclosed an "abandoned and malignant heart," it is the case of this defendant.

Id.—Misconduct in Argument—Objection—Review on Appeal.—Objectionable remarks by the district attorney in a criminal case will not be reviewed or considered on appeal, unless they have been objected to at the time they were made, so that the trial court might have been accorded an opportunity to counteract their effect upon the jury.

Id.—Verdict—Delivery of Form to Jury Fixing Place of Imprisonment.—The delivery by the court to the jury in a homicide case of a form of verdict designating the place of imprisonment in case the defendant is found guilty, while improper, is not prejudicial as being suggestive.

APPEAL from a judgment of the Superior Court of Solano County. A. J. Buckles, Judge.

The facts are stated in the opinion of the court.

John R. Cronin, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant was convicted of murder of the first degree, the jury fixing the penalty at imprisonment in the state prison for life. (Pen. Code, sec. 190.)

This appeal is by the defendant from the judgment.

The homicide, resulting in the death of one E. G. Piercy from a gun-shot wound inflicted by the defendant, occurred at the Hotel Bird, in the town of Benicia, Solano County, on the night of the twentieth of February, 1913. The defendant was, at that time, and had been for some months previously, em-

ployed by the San Francisco Bridge Company, which was then operating in said town of Benicia. The defendant was the foreman of the drillers who were employed by said company. The deceased was a temporary guest at the hotel, having registered thereat only a few days prior to his death.

It is not denied that the defendant fired the shot which produced the death of Piercy. He interposed the defense of insanity, claiming that, when he fired the fatal shot, he was mentally deranged to such an extent that he could not and did not know the nature and quality and wrongfulness of his act.

It appears that a number of the guests of the hotel, including the wife of the proprietor and her sister, after the dinner hour on the day of the homicide, for the purpose of engaging in a social dance, repaired to a room in the hotel customarily used by traveling drummers in which to display samples of their goods and wares. This room is on the first floor of the hotel and adjoins the bar-room. The defendant's sleeping room was situated in the second story of the hotel and immediately over the sample room, in which the dancing was going on.

The defendant had been indulging heavily in intoxicating liquors during the early evening of the night of the homicide and at the time he fired the fatal shot was considerably under the influence of liquor. He appeared to be generally in a disgruntled mood and, during the evening and while the dancing was in progress, complained in the presence of several persons that the music produced by the electric piano annoyed him. At about 11 o'clock, he entered the sample room and, as one Camp was about to engage in a dance with Mrs. Bird, wife of the landlord, he (defendant) objected, but for what reason no one seemed to know. Camp said that the defendant appeared to object to his dancing with Mrs. Bird but that he "mumbled" so that he could not understand what he was saying. Camp then took the defendant out of the room into the bar-room. Camp then returned to the sample room. The defendant shortly thereafter went to his own room, procured a revolver, stepped to the door leading into the sample room, and from that point, and with the exclamation, "stop it, stop it, stop it," or words of similar import, fired five shots in rapid succession into the party, one of them striking and wounding one Chester C. Hoyt, one of the participants in the dancing

festivities, and another striking Piercy. The wound received by Hoyt was in the right thigh, and was not fatal. The point of entrance of the shot that struck Piercy was through the fleshy tissue of the right thigh and about two and a half inches below the crest of the hip bone. The deceased complained of pain in the bowels and an operation by the surgeons disclosed that the bullet had penetrated the bowels, causing four distinct perforations thereof. The bullet was found lying loose in the abdominal cavity, in the region of the left kidney. Piercy died the night following that of the shooting at about 11:30 o'clock. The attending surgeon testified that the wound was necessarily mortal.

The first point made by the defendant is that the court erred by refusing to grant his motion to set aside the information upon which he was tried and convicted upon the alleged ground that he "had not been legally committed by a magistrate." (Pen. Code, sec. 995.) The specific contention in this respect is that the magistrate before whom the defendant was examined failed or omitted, before the examination was proceeded with, or at any time during the progress of the proceedings, to "inform him of the charge against him, and of his right to the aid of counsel in every stage of the proceedings." (Pen. Code, sec. 858.)

It appears from testimony taken on the motion to set aside the information that the accused, accompanied by his attorney, J. R. Cronin, appeared before the magistrate at the time fixed for the preliminary hearing, and that, before the taking of testimony was begun, the district attorney, addressing the defendant, "asked him if he was familiar with his rights" and he said "yes." Thereupon the district attorney, addressing Attorney Cronin, who was then engaged in conversation with the defendant, asked "if he would waive the reading of the complaint," to which question counsel answered in the affirmative. Thereafter the preliminary hearing of the charge against the accused was proceeded with, Mr. Cronin representing the defendant throughout the entire hearing and until its conclusion.

Section 860 of the Penal Code provides that "if the defendant requires the aid of counsel, the magistrate must, immediately after the appearance of counsel, or if, after waiting a

reasonable time therefor, none appears, proceed to examine the case.''

In this case counsel did appear for the defendant before the magistrate, and the magistrate was, therefore, authorized to proceed with the hearing. It was clearly unnecessary for the magistrate to go through the formality of advising the defendant of his right to the aid of counsel when it appeared that the latter had already exercised that right by employing an attorney to represent him at the hearing, the attorney so retained being present with the accused in the magistrate's court when the case was called for examination.

Nor does the fact that the complaint was not read to the defendant constitute, under the circumstances attending the omission to do so, a ground upon which it may justly be held that the accused had not been legally committed by the magistrate. Of course, a person who is brought before a magistrate on a criminal charge—that is, for a felony or other crime which is required to be preliminarily examined as a prerequisite to the filing of an information in the superior court—is entitled to be informed of the nature of the offense with which he is charged before the magistrate may proceed to take testimony or depositions in support of the charge. This information he is entitled to be provided with in order to enable him to prepare to meet the charge against him. The statute does not in terms declare that the complaint shall be *read* to the defendant, but the magistrate must *inform* him of the charge, and we apprehend that the mere statement by that official in a general way of the nature of the charge would satisfy the requirement in that regard. However, that the defendant in this case had knowledge of the contents of the complaint or of the nature of the charge therein preferred against him, is implied from the fact that the attorney representing him at the hearing waived the reading of the complaint in his presence and from the further fact that, through his attorney, he announced himself ready to proceed with the examination. Under such circumstances it would be carrying technicality to the extreme limit to hold that the case should be re-examined before a valid information could be based upon the commitment therein issued, merely because the formal reading of the complaint had been omitted by the examining magistrate, assuming that the statute contemplates

that the complaint must always be read in such cases.  At any rate, the defendant certainly cannot claim that he suffered actual damage, either at the examination or at the trial, by such omission, and, assuming that the court below, in denying the motion to set aside the information, committed error, it is a mere technical error, innocuous in its effect upon the rights of the accused, and of which it cannot, consequently, be said, after an examination of the entire record, including the evidence, that it "has resulted in a miscarriage of justice." (Const. art VI, sec. 4½; *People* v. *Tomsky,* 20 Cal. App. 672, [130 Pac. 184].)

The point is made with apparent seriousness that the evidence does not justify the verdict because it fails to disclose that the act of the defendant in shooting into the crowd of dancers was accompanied by malice.  "Murder is the unlawful killing of a human being, with malice aforethought." (Pen. Code, sec. 187), "Such malice may be express or implied.  It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."  (Pen. Code, sec. 188.)

The evidence, as we have shown, discloses that the defendant seriously resented the noise producd by the electric piano in the room in which the dancing was going on and expressed himself as being greatly annoyed thereby.  He was in a quarrelsome frame of mind during the entire evening, up to the time he fired the shots into the dancing party.  He stepped to the door leading to the dancing room and making the exclamation above referred to, evidently thus referring to the music, deliberately fired into the party, with the result as already described.  Even if it may in strictness be said that this evidence does not show express malice, it is certainly sufficient to warrant the implication of malice.  There was no provocation for the shooting, and the circumstances clearly disclose, in our judgment, "an abandoned and malignant heart."  It does not follow, merely because the defendant might not perhaps have entertained any personal ill-will toward the deceased, that the shooting and killing of the latter was not with the malice essential to the consummation of the crime of murder.  The deliberate and unnecessary discharging of a

gun into a multitude of people, with an utter disregard of the consequences of the act, whereby human life is destroyed, is murder, and malice will be implied, although the perpetrator of the act had no malice against any particular person of the multitude into which he so fired. (Bishop's New Criminal Law, sec. 314, vol. 1, and sec. 688, vol. 2.)

It is next objected that the court erred to the serious prejudice of the rights of the accused in reading to the jury the instruction that, although the defendant, at the time he committed the act, was laboring under partial insanity, "if he still understood the nature and character of his act and its consequences, and had a knowledge that it was wrong and criminal, and he had mental power at the time sufficient to apply that knowledge, and to know if he committed the act he would be doing wrong, and receive punishment, and that he possessed a will sufficient to restrain the impulse he may have had to kill, arising from his diseased mind, then such partial insanity will not exempt him from responsibility, under the law, for such act, and you should find him guilty, in the degree shown by the evidence," provided the jury were convinced by the evidence beyond a reasonable doubt that the killing of the deceased by the defendant was without legal justification or legal excuse.

We perceive nothing erroneous in the general purport of the foregoing instruction. It has never been doubted in this state that a person may be held for a criminal act if, at the time of committing such act, he fully knew the wrongfulness and criminality thereof, notwithstanding that he may at the time be partly insane or a monomaniac upon some subject other than that to which his criminal act related. But the language of the instruction appears to go so far as to imply that even if the defendant was, at the time of the killing, fully capable of appreciating and knowing the nature and quality and wrongfulness of his act, he would be immune from responsibility if it was made to appear that he was, at the time, without sufficient volitional power to restrain himself from committing the act. If this be the true construction of the language of the instruction, it is to that extent erroneous. (*People* v. *Hoin,* 62 Cal. 120, [45 Am. Rep. 651].) Of course, a person having the mental capacity to know the wrongfulness and criminality of a certain act, has the capacity equal with such knowledge

to restrain himself from committing it, and where, under such circumstances, he does not so restrain himself but commits the act, his conduct in that regard will be ascribed by the law to a deliberate purpose or intent to do the wrong. That part of the instruction as so construed, however, was favorable to the defendant and he cannot, therefore, justly claim that he suffered any damage therefrom.

The court read to the jury several instructions, based upon and in the language of section 22 of the Penal Code, declaring that "no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition," but that where the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, evidence of the intoxicated condition of the accused at the time of committing the act is admissible and may be considered by the jury in determining the purpose, motive, or intent with which he committed such act. It is here argued that said instructions were without pertinency to any issue in the case, and that thus a factor was improperly injected into the case which "tended to confuse and did confuse the jury in arriving at its verdict." The instructions were peculiarly appropriate to the case as made by the evidence and, therefore, properly given. As seen, the sole defense was the claimed mental irresponsibility of the defendant at the time he committed the act, and his contention at the trial was that his insanity had been partly superinduced by an excessive use of intoxicating liquors prior to the time of the homicide. The claim of the district attorney was that he was not insane when he fired the fatal shot, but that he was merely in a state of intoxication, in which condition he had voluntarily placed himself. Considerable testimony was addressed to this feature of the case, and the people were entitled, of course, to have the law upon that subject explained to the jury. This the court did fully, clearly, correctly, and, as stated, most pertinently.

The instruction in which the court cautioned the jury to examine with care the defense of insanity interposed by the defendant "lest an ingenious counterfeit of the malady furnish protection to the guilty," is, to some extent, justly criticised, but we think its effect cannot be held sufficient to justify

a reversal of the case. The same instruction has often been given in criminal cases in which the insanity of the accused has been set up as a defense, and has received the approval of the supreme court. (See *People* v. *Dennis,* 39 Cal. 625; *People* v. *Bumberger,* 45 Cal. 650; *People* v. *Pico,* 62 Cal. 50, and *People* v. *Larrabee,* 115 Cal. 158, [46 Pac. 922].) In the case of *People* v. *McCarthy,* 115 Cal. 255, 264, 265, [46 Pac. 1073], however, the supreme court took occasion to criticise the instruction and to suggest that it were better never to read it to the jury, and with that suggestion we are in accord, as we regard such a statement by the court in its charge as verging too closely upon the domain of questions of fact—that is, as approaching an instruction upon the effect of the evidence. However, the court in that case held that, the instruction having been theretofore approved in several cases, a reversal could not be justly predicated thereon. (See *People* v. *Methever,* 132 Cal. 326, 330, [64 Pac. 481].)

The defendant makes a general objection to the action of the court in giving other instructions and in refusing to read to the jury a large number of instructions proposed by him. In his brief, the defendant does not point out the alleged errors thus referred to, but in effect suggests that this court will discover such errors by reviewing "all the instructions, given and refused by the trial court, so that more extended remarks in this brief on that subject are unnecessary." But this court is not required to discharge a duty which rests entirely upon an appellant in a criminal case or his counsel. Where error is claimed in the rulings or instructions of the trial court, it is the duty of the party complaining on appeal to point out the error, otherwise it will not be reviewed, as it is not incumbent on a reviewing court to search through the record for the purpose of discovering for itself wherein the action of the court in the respect complained of involved error prejudicial to the defendant. (*People* v. *Chutnacut,* 141 Cal. 685, [75 Pac. 340]; *People* v. *Pembroke,* 6 Cal. App. 593, [92 Pac. 668]; *People* v. *Balmain,* 16 Cal. App. 33, [116 Pac. 303].) We have, however, carefully read the full charge of the court and, furthermore, have taken the pains to examine those instructions submitted by the defendant but rejected by the court, and thus we have found that the court's charge clearly and correctly covered every essential phase of the case,

and that the rejected instructions referred to amounted only to a repetition of a statement of the principles which were declared to the jury in the general charge of the court.

It is urged that the district attorney, in his address to the jury, was guilty of misconduct which seriously militated against the defendant by declaring that, if there ever was a case arising in his experience of six years as district attorney, in which there was disclosed on the part of any man accused of murder "an abandoned and malignant heart—— . . . an utter abandonment . . . to regard human life as sacred— . . . it is the case of this defendant, Andrew Stein, on trial here to-day for his life."

The foregoing language was, in our opinion, perfectly justified by the evidence. We have said as much in another part of this opinion. We can conceive of no stronger evidence of "an abandoned and malignant heart" than that which discloses the act of deliberately and recklessly discharging a gun into a crowd of people with a total disregard of the consequences thereof. But if it were to be said that the language was wholly unwarranted by the record and imported into the case matters wholly foreign to the issues, it is to be remarked that the defendant is hardly in a position justly to complain of any damage which might have followed therefrom, since it does not appear in the record that he objected to the remarks complained of when made or called the attention of the court thereto at the time, so that they could have been ordered stricken out and the jury instructed not to pay heed to them. Over and over again, the appellate courts of this state have held that objectionable remarks by the district attorney in a criminal case will not be reviewed or considered unless they have been objected to at the time they were made so that the trial court may be accorded an opportunity to counteract, if it can thus be done, their effect upon the jury. (*People* v. *Kramer,* 117 Cal. 647, 651, [49 Pac. 842] ; *People* v. *Brittan,* 118 Cal. 409, 412, [50 Pac. 664] ; *People* v. *Shears,* 133 Cal. 154, 159, [65 Pac. 295] ; *People* v. *Ruef,* 14 Cal. App. 576, 619, [114 Pac. 48] ; *People* v. *Amer,* 8 Cal. App. 137, 143, [96 Pac. 401] ; *People* v. *Ah Fook,* 64 Cal. 380, 383, [1 Pac. 347] ; *People* v. *Ye Foo,* 4 Cal. App. 730, 740, [89 Pac. 450] ; *People* v. *Owens,* 3 Cal. App. 750, 752, [86 Pac. 980] ; *People* v. *Beaver,* 83 Cal. 420, [23 Pac. 321] ; *People* v. *Frig-*

*erio,* 107 Cal. 153, [40 Pac. 107]; *People* v. *Owens,* 132 Cal.
469, 471, [64 Pac. 770]; *People* v. *Salas,* 2 Cal. App. 537,
540, [84 Pac. 295]; *Horn* v. *State,* 12 Wyo. 162, [73 Pac.
705].)

Among the several forms of verdict which the court delivered to the jury upon the submission of the case, was the following: ''We, the jury in this case, find the defendant, Andrew Stein, guilty of murder of the first degree, and further find that as a punishment for the same that the said Andrew Stein be imprisoned in the state's prison, at Folsom, for his natural life.'' Having, in the exercise of the discretion committed to them in that particular, decided to fix the penalty at imprisonment for life (Pen. Code, sec. 190), the jury returned their verdict in the foregoing form. It is now contended by the defendant that, inasmuch as the form of the verdict so delivered to the jury expressly named the particular prison in which the defendant should be confined if the jury concluded to fix the penalty, the action of the court in that respect was erroneous and prejudicial. It is argued that the form of the verdict as thus handed to the jury was ''suggestive,'' and that the fact that the jury returned a verdict to which that form was appropriate shows that the act of submitting to them a verdict in that form had a prejudicial effect upon the minds of the jurors.

Obviously, while it is within the discretion of the jury in cases where they find that a homicide constitutes murder of the first degree to fix the penalty at imprisonment for life, it is not within their legal province to name or fix the particular prison of the two in this state in which the defendant shall be confined, since the statute confers upon them no such authority. The legislature evidently intended that that duty should be a function of the court, and it was improper, of course, to have expressly mentioned in the form of verdict the prison in which the accused should be incarcerated in case the jury, upon finding him guilty of murder of the first degree, fixed the penalty at life imprisonment. But the words ''at Folsom,'' as used in the form of verdict, were mere surplusage, and could have exerted no influence on the minds of the jury in the determination of their verdict. We must presume that the members of the jury were possessed of sufficient intelligence to fully comprehend and understand the

instructions of the court that they were to be governed entirely, in reaching a conclusion upon the facts, by the evidence, and that thus they were guided in determining what their verdict should be and not by the trivial suggestion that a particular prison might be his place of confinement, in the event of his conviction of first degree murder and his punishment fixed by the jury in the exercise of the discretion confided to them by section 190 of the Penal Code as to the penalty in such cases.

We have now considered all the points pressed upon us for a reversal, and our conclusion is that the defendant was accorded a fair trial, that his conviction appears to be just and that the punishment meted out to him is merited.

Accordingly, the judgment is affirmed.

Chipman, P. J., and Burnett, J., concurred.