[Crim. No. 2585.   Second Appellate District, Division One.—November 22, 1934.]

THE PEOPLE, Respondent, v. RHODA LINN COBLER, Appellant.

Vincent A. Marco for Appellant.

U. S. Webb, Attorney-General, and Eugene M. Elson, Deputy Attorney-General, for Respondent.

HOUSER, J.—From a judgment rendered in pursuance of her conviction of the crime of murder in the first degree,

with the penalty therefor fixed at life imprisonment in the state prison, as well as from an order by which her motion for a new trial was denied, defendant has appealed to this court.

Briefly, the incriminatory evidence adduced on the trial of the action included a showing that, under the pretense given by defendant to a druggist that she wished to poison some gophers, defendant purchased fifteen grains of strychnine, which was placed in a paper wrapper and labeled "POISON". She registered with the druggist under an assumed name and a fictitious address. She did not use the strychnine for the asserted purpose for which the strychnine was purchased; but five days after such purchase was made by defendant, in preparing breakfast for her husband, she placed "about one-third" of such strychnine in a glass of milk and gave it to her husband to drink. However, before doing that, in the kitchen sink she burned the paper wrapper that had been the container of the strychnine. She also threw "down the sink" the remaining strychnine that she had not placed in the milk. After the husband had drunk some of the poisoned milk, he complained that he did not "feel good"; and very soon thereafter, in attempting to rise from a "Morris" chair in which he had been sitting, fell to the floor. In such fall his head first struck against a stone in the mantel of a fireplace, and again on an iron "smoking stand" that was practically demolished by reason of such contact. The defendant then called a doctor and other persons to assist in rendering aid to her husband, who died within about thirty-five minutes after drinking the milk that contained the poison. The attending physician testified that on his arrival at the home of defendant and her husband, he found the husband lying on the floor, unconscious, and undergoing convulsive seizures and rhythmic contractions of the heart, lungs, abdomen and facial muscles;—which conditions continued until his death. The doctor further testified that the symptoms of strychnine poisoning were rhythmic convulsions, spasms of the muscular system of the body and spasmodic respiration at rapid rate; all of which were apparent with reference to Mr. Cobler's condition. Furthermore, that in his opinion, the cause of Mr. Cobler's death was strychnine poisoning, and that the blows on the head which he had received apparently at the

time that he fell to the floor from the effects of such poison, had not contributed to his death. Also, that at the time he saw Mr. Cobler, blood was coming from a minor laceration on the side of his head, which ran into his ear; but that such laceration would not cause death. Another doctor, who performed the autopsy on the body of Mr. Cobler, testified that in his opinion the cause of death was strychnine poisoning, and that a minimum amount of strychnine to be non-poisonous in its effect on a human being is one-twelfth of a grain. A chemist testified that in 157 grams of stomach content of the deceased (which was about one-fourth to one-fifth of the total content of the stomach), he found one and one-half grains of strychnine; and that in 250 milligrams of the liver he found one-fiftieth of a grain of strychnine.

On her own behalf, defendant's testimony included the statement that her husband drank alcoholic liquor to excess; that she knew that strychnine was poisonous, but that she did not know its strength as such; that she gave the poison to her husband "to make him sick", in an effort to frighten him and thereby to stop his excessive indulgence in intoxicating liquor; and that when he fell to the floor "blood flowed out of his ear all over the floor; . . . came out of the inside of his ear".

Each of two doctors in effect testified that in his opinion "the man died of a fractured skull"; or "brain injury"; and based such opinion on the evidence regarding the symptoms and general conditions that were present preceding the death of the husband of defendant. Each of such doctors also stated that such symptoms or conditions were not typical of strychnine poisoning, but more properly were typical of brain injury.

█ Appellant has ably presented the point that, considering the evidence adduced on the trial, particularly that which related to the cause of death of the husband of appellant, necessarily the jury indulged in speculation in reaching its conclusion that death was produced by strychnine poisoning, rather than by a fall which resulted in a "brain injury". The precise point of appellant's argument appears to be that if it were established that before the strychnine had been absorbed into the blood stream and therefrom had acted upon the nervous centers or system of the body, the husband of defendant had suffered an intervening

"brain injury" of such severity that it was the cause of his death,—the defendant could not legally be convicted of his murder. But the answer to such suggestion is twofold: First, provided that the evidence was substantial (which, in view of the testimony given by the two doctors introduced by the prosecution, cannot well be disputed) to the effect that death was the result of strychnine poisoning, the determination by the jury, both as to the direct cause of death and as to whether the "brain injury" was produced by the effect of strychnine, was conclusive. ■ And, secondly, notwithstanding the fact assumed by appellant that the "brain injury" was the cause of death, the principle of law is well established that if the strychnine taken by Mr. Cobler was sufficient to cause his death, the fact that the "brain injury" sustained by him was produced by the effect of the strychnine, may have been fatal in itself and accelerated the death of the victim, cannot have the effect of relieving defendant from responsibility for her act in administering the poison in the first place. (*People* v. *Lewis*, 124 Cal. 551, 554 [57 Pac. 470, 45 L. R. A. 783]; *People* v. *Fowler*, 178 Cal. 657, 668 [174 Pac. 892].)

■ Appellant urges the point that the trial court committed prejudicial error against her defense to the action in sustaining an objection interposed by the prosecution to each of two questions that were asked by defendant of a doctor who had qualified as an expert witness. By such questions it was sought to be ascertained (1) what "symptoms" occur "after a hard blow on the head", and (2) what were "symptoms of a fractured skull". Although it appears that neither of such questions was answered directly, the record discloses the fact that in giving his reasons for his opinion that the cause of death was "brain injury", the doctor included therein all the symptoms and conditions which the evidence theretofore given had shown were present. So that, in any event, no harm resulted to defendant from the ruling of which complaint is made.

■ Another complaint is registered by appellant to the effect that on propounding a hypothetical question to a witness, on objection made by the prosecution, by order of the trial court it became necessary to include in such question several facts which were in evidence but which had been omitted from the question as originally propounded.

Again, the record shows that, notwithstanding the inclusion in the question of such originally omitted facts, the answer to the question as finally given by the witness was altogether in favor of defendant;—from which it follows that the point suggested by appellant is untenable.

Appellant predicates prejudicial error affecting her defense upon the fact that the trial court refused to give to the jury a certain instruction which dealt with the possibility that defendant was guilty of murder in the second degree. But clearly on the evidence, rightly there could be no verdict by the jury that murder in the second degree had been committed by defendant. She was either guilty of murder in the first degree, or she was innocent of the commission of any homicide. She was not entitled to have the proffered instruction given to the jury.

The judgment and the order by which the motion for a new trial was denied are affirmed.

Conrey, P. J., and York, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 20, 1934.